Last case for argument this morning is 22-2215 Lubbonnet Internet Media Services v. Pandora Media, LLC Good morning, Your Honor. May it please the Court. My name is Rob Bernelli. I'm with the counsel table. This is Brian Carpenter. I represent Lubbonnet, the patent owner, and the plaintiff below. Lubbonnet requests the Court reverse the District Court's findings on Rule 12c motion that all of the patents asserted in this case are invalid under 101. We're going to start our analysis today with Alice Step 2. Specifically, as this Court knows from its opinion in Artrix, where you have a complaint that has well-plaid facts that identify the inventive concept and then provides detail about that inventive concept in the complaint, that should be accepted by the District Court at a 12c motion stage, and that should be the end of the discussion. Here we have a complaint with those allegations, but that also includes a declaration from Dr. Almaroff, 36 pages, very detailed. It talks about the state of the art, talks about why these claims, specifically 753 patent claim 1, which is the representative claim we're dealing with here, why that claim and others like it shows an inventive concept. If that complaint, including the declaration, is inconsistent with the patent itself, the District Court is not obligated to credit what your expert or your complaint say. Isn't that right? If it is objectively inconsistent, I think that is correct, Your Honor. And if what your complaint or your experts say is merely conclusory, then the District Court is not obligated to credit it, correct? Correct. And if what you put in your complaint or your expert declaration is simply a legal conclusion, the District Court is not obligated to credit it? That is, again, true, Your Honor. And so isn't all of that what happened here? That at the end of the day, when you sift through the lengthy complaint and the declaration, all that's left are things that are either conclusory, legal, or entirely inconsistent with what the patent itself says. No, I don't believe that to be the case, Your Honor. Give us an example of where that's wrong. If we look at, this is from the first amendment complaint, paragraph 62. Can you give us a page size for that? Appendix page 9596. Thank you. So we've got paragraphs 60, 61, 62, 3, 4, and 5. Paragraph 60 identifies a number of elements that are in the representative claim that then talks about, it identifies those elements. Then each of the following paragraphs takes those elements and talks about why it was an inventive concept at the relevant time. Remember, this is going back to 2000, 24 years ago. So we have to put our hat on that says we're looking at this from back then. Yes, everything that's disclosed here today seems pretty normal. This is the way things would happen. Twenty years ago, 25 years ago, this was not normal at all. This could not be done, being able to go to a remote server that has content on it, be able to characterize that content. Your view is that's why you're emphasizing step two, I take it, is because step two is looking at one of the things it looks at is whether there's an inventive concept, but something that's conventional and routine can't be an inventive concept. Correct. So it's good at least that step two takes this into account, given the age of the invention. Correct. Yes. And I think what happened here is it is commonplace today, 25 years later. It was very unique 25 years ago. We've got Dr. Almaroff providing his opinions as to what was going on 25 years ago. We've got the district court judge supplanting what Dr. Almaroff, the technician, the technical expert, what was happening, what he knew was happening, taking all of that, discounting it to zero, and saying, I look at these claims and I find that they are, there's nothing here. In your language, the law says to discount it to zero if it's merely the practice of an abstract idea using conventional computer hardware. Correct? That sounds correct, Your Honor. Yeah. Yeah. What I want to point out, specifically on this step two, and then we can move to step one, is if we look at appendix page 30, which is page four of the district court's decision, we've got the district court talking about the inventive concept and specifically reciting the secured mail solutions versus universal wild case. And in that case, this court ultimately affirmed a decision where… Can I ask you something? Yes. I just want to make sure I understand. For the inventive concept, what is the inventive concept that you're focusing on right now in the context of your argument? Is it the playlist generator? Or is it the ordered combination? It's the ordered combination. Okay. Yeah. Playlist generators, I understand the technology being existed. They didn't exist in this form. You could generate a playlist, but not like this. And the ordered combination argument is? You have a remote server that has content on it, you've got a user device, and you've got a back-end system. And the user device needs to be able to access the content on the remote one or more servers. And you've got the back-end system that is able to identify where the content is on the one or more servers. And you've got the user device communicating with the back-end system. Once you're at the back-end system, it is focusing on a ratings system. And then the ratings system has its own three components that are required to… So what is not routine about that? The way you do it, which I think Judge Stark may have been hinting at, isn't that including the abstract idea that you don't put in play when you're evaluating an inventive concept? You're saying it's inventive because nobody ever did this abstract idea before. No, it's inventive because of the unique distributed architecture that's laid out in the claim. That's specifically required by the claims. You have to have your user device has to be able to communicate very specific types of information to the back-end system, which then captures that information, stores it electronically, and then is able to take that information. This back-end system also knows where the content of interest is located. Take that and have it in its databanks as well, and then have the back-end system, the ratings system, ultimately identify the locations of the relevant content that the user wants, have it packaged, and then have it sent back to the user device. That's all very specific. It's specific, but that's not the issue. The specificity isn't there. I understand one other step, too. No. No. This is... It's this concept of being able to go between... It's more than the concept. It's the requirement that you have to go between all these various devices in an order that allows for the invention to be achieved. You cannot achieve the generated playlist desired by the user without the ordered combination of all these elements, and the claim specifically calls them out. I have a quick claim construction and a quick transfer question for you. On claim construction, because the claims were already construed in Texas before the case went to California, you say there was no procedure in place to facilitate resolution of claim construction disputes that I guess you want us to think only arose after you got to California. I don't understand that, that there's no procedure in place to facilitate resolution. Did you even ask the district judge, hey, can we do some more claim construction in order to give you what you need to resolve the 101 motion? I believe it came up in the scheduling conference, but I may be misremembering. All right. What is it that you mean that there is no mechanism? There was nothing stopping you from asking, was there? No, it could have been asked. But we didn't know there was a claim. So the posture here was we're in Texas. Right. You didn't know until they filed their motion for judgment on the pleading. At that point, we were down the road. At that point, we didn't ask for claim construction. Okay. And now on transfer, I haven't seen this procedural situation before. It's an odd one where we've granted the mandamus and now you're on appeal from losing in the transferee court. It would seem to me the only way you could get review of that would be to ask us not to reach the merits of your appeal, but to remand back to the Northern District of California to make your transfer argument. Maybe you win, maybe you lose, and then you come back and press your appeal if you're unhappy with it. I don't see how we can decide ourselves now to transfer a case that's completed. I believe you are correct in the way you've postulated. And is that what you're asking us to do, not reach 101 and just go right to the transfer issue and remand it? No. Okay. Thank you. Am I going to get on the other side here? Absolutely. May it please the Court. Brian Kahn for Pandora Media. Let me just start off by answering the question that the Court posed to counsel regarding requesting more claim construction. The answer is just no. And, in fact, during I think it was the case management conference, Blue Bonnet actually stated that no more claim construction was necessary, that the Texas court had thoroughly considered the issues and had a hearing on the argument and reached the correct constructions. That was what was represented to the California court during the case management conference immediately after transfer. And then there was no request by Blue Bonnet at any time during the I think it was about six to seven months, if not more, period, that we had two motions for judgment on the pleadings as well as motions to amend pending. And coming back, I just want to address the notion that there's the ordered combination as the inventive concept. First of all, there is no claim construction on an ordered combination. There also was no request for claim construction. But, nevertheless, counsel kind of touched on it. The order of the steps as they appear in the claims are the necessary order to just implement the abstract concept. And you have to have- What about the conventionality of those kinds of networks at the time of the invention? Even though the invention was a long time ago, what about the conventionality of having a computer, a server, and a back end? I mean, I guess I might have that wrong on what the elements are, but you understand what I'm saying. I do understand, Your Honor. They were conventional. In fact, the specification itself just describes using any general purpose computer. But the whole network. He was emphasizing the structure of the network. And maybe it was that he was emphasizing it for the purposes of streaming music. But I want to understand your view on the network as opposed to just a computer system. Sure. There's actually two different answers to it. So in the specification, there's a section entitled distributed architecture. In that section, the specification talks only about- It's also referred to as the playback architecture, playback distribution architecture. In that section, it's talking about crawling the internet and finding songs that are posted on random websites all over the internet. And using that as the source of music that you will then play back to users. That's not what we're dealing here with. That's not what's in the claims. And it's certainly not what Pandora does. It's not accused of infringement. And that is what the specification describes as distributed architecture. In its briefing, Bluebonnet focuses significantly on the five distinct hardware devices that it says exist in the claims. And it says that those are distributed. And that there's a front end, middle- First front end, back end, and I'm blanking on- Of course, we should be looking at the claims. Right. Right? I mean, there are some references to internet, but it doesn't specify this element talks to this element. Five elements talking over the internet. Right. And the claims themselves, you have the playback interface, which is the client device. And the patent describes it as a general purpose computer or a smartphone. And then it sends rating information that the user inputs to what's referred to as- And the rating component stores that in a database. And then that data is then used by the playlist generator to generate playlists. All of those- Those are the separately listed elements of the claims. Now, if you look back at the specification, it describes each of those as a module. It says, you know, playback- I'm sorry. Playlist generator module, a rating module, or a rating component module. And the specification expressly defines module. And I'm looking for the site for that. It is appendix 76, column 11, 42 to 48. Lines 42 to 48. And what it defines as a module is pretty much anything. It says it can be hardware or software or a combination of both. And it expressly states that the modules can be separate from each other or the modules can be combined. And they can be combined on the same hardware or in the same program. And so the notion that the claims themselves, the claim limitations, require separate hardware devices, just simply isn't supported by the specification. The specification describes them as modules, which could be hardware, could be software.  Would it make a difference to the 101 analysis if the claims were construed as five separate pieces of hardware? I don't think so, Your Honor. I'm happy to address that. The reason why I'm focused on it is because that is the basis for Blue Bonnet's notion that there is an inventive concept. The premise of their position is that there's five hardware devices and then those are distributed. And that's just simply not the case with the claims. But there are some things that are distributed, clearly, in this claim. I mean, right? I mean, and if you disagree with me, but it says, for example, the rating component receives, via the Internet, the rating from the streaming media clip's rating system. So there's some network aspect to this claim. Correct. And I'm sorry if I wasn't clear before. Okay. You have the client device. My question to you was, what evidence do you have that at the time of the invention this was conventional? I just, that's what I was going to say. So what the claims have are a client device, there's the Internet in between, and then there's server. That is the basic architecture of the Internet. The Internet runs on servers. And, in fact, I even think that the specification talks about using, you know, standard servers. So it itself admits that there are, the existence of servers and client devices predate the patent itself. But just the sheer notion of having a client device interacting with a server is the foundation of an Internet web page. That's how they're generated and how they're viewed. And just briefly, what difference, you say it wouldn't make a difference if it was five pieces of distributed architecture. Why not? There's, so the notion that Bluebonnet has raised is that it somehow solves a scalability issue. And when you have just different, it has a database, a ratings component, I'm sorry, the rating component, and a playlist generator. There's, it's a conclusory statement to say that somehow allows it to scale. There's no explanation about how having those three devices separate actually contributes to scalability or allows it to handle a large volume of music. The large volume of music is just a sheer data issue with where you're going to store all of that. And if the specification refers to that as a remote, I mean, sorry, the claims refer to that as a remote server. The architecture of scalability that Bluebonnet contends is relevant here in Inventive Concept would require that remote server to be scaled in various servers all over the Internet. As the specification describes the Internet crawling feature. But that's just not what the claims say. And that's not, if you treat that as a single hardware component, that's not what Bluebonnet's arguing either. At step two, your friend points us to, for example, paragraphs 60 through 65. Is there, without having to hopefully march through the detailed allegations in each of them, what's your response to why those are not taken as true out of Rule 12 enough to at least get him past the motion? Yeah, I think I can do it quickly. The 60 is just identifying the various five elements. 61 is referring to the remote server. And that is just a single hardware device. In Bluebonnet's eyes, I don't even think it constitutes that. But it is not a multi-server hardware device, multiple hardware devices. And therefore, it just doesn't even follow the description in the specification. 62 deals with the playlist generator. I mean, they're just saying here that that's a novel idea. But the only thing that's disclosed in the specification is the concept of having a general purpose computer, server, whatever, perform the functionality that's described. There's no actual new system that's described. Nothing is provided and put into the claims that actually makes that something that's new. It's just taking ratings and generating playlists. 63 is referring to the inverted conventional media distribution paradigms. This goes back to what the specification does refer to as the distributed architecture, which is crawling the Internet for the various music files and playing them from the servers. If the Court of Appeals of Federal Circuit had an audio file on its website, that could serve as an audio file that is played through these playlists. And that's just not at all what the claims are about. And then 64 is referring to the combination. And I think I've already addressed the combination point. And then the paragraph 65 is actually about the client side and having a playback interface that allows for the acceptance of ratings. And again, that's not the invention as a whole. That's just saying that there hasn't been an individual interface that allows for this. And novelty alone of one individual element isn't the standard here. When we're talking about step two, it's whether what's disclosed in the specification and as claimed actually is an inventive concept. And you're looking at what the abstract idea is and takes it out of that zone. And so the fact that it's wrong, but accepting it as true, that there was not an interface that allowed you to submit ratings, the claims don't actually talk about anything more than a general purpose computer or PC that performs that function. And that sort of functional claiming doesn't satisfy the requirement for step two. Just one last question. They have an interesting point that you don't make any analogies, and I think the district court doesn't, to any similar 101 cases. We have a lot of 101 cases now. I don't know that we've ever said you have to use analogies, but we have said it's a very useful tool. And we usually engage with it. Is there a reason that you're not trying to analogize this case to any other 101 cases? I agree that I don't believe it's a requirement. Thinking back to it, I don't think there's any particular reason one way or the other. I do think that the district court's citing of the TLI communications case is pretty on point. But at the same time, I think when you're looking at, from my perspective, a lot of the cases, when you talk about what makes a set of claims invalid under 101, it is just the notion of collecting and processing data. And these claims plainly do that. And so, to me, the notion of that, the idea that they were, the claims were, and that comprised an abstract idea under 101, seemed pretty straightforward to me. And I thought that the step two analysis and whether it was the bigger issue here, and I think that was more about going through the pleadings and addressing what's actually disclosed and how that relates to the claims. Thank you. Thank you. Thank you. The only evidence in the record, and it was tied to the First Amendment complaint, is the Al Morath Declaration. And it says what it says. What I'm hearing is what word or words within Representative Claim 1 kind of drives this home. And I think those words are automatically and dynamically. Those words mean, and they are associated with the generate a playlist. Playlist has to be automatically generated and it has to be dynamically generatable. What does that mean? Again, it goes back to the interaction between all these various hardware components. But it's not a one-time deal. There has to be this interoperability between the various components. I think that is the language that takes this out of the abstract idea and into an inventive concept. The cases that we would have this panel focus on in doing the analogy would be the MDOCS versus OpNet case, the DDR Holdings case, DDR Holdings versus Hotels.com. It's our contention that when that analogy analysis is conducted, these claims that have been found invalid by the district court should not have been found invalid. This is a very similar situation certainly to MDOCS. I'll cede the rest of my time. Thank you. Thank you.